UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:03CR86(JCH) |
| ANTOINE MORGAN | : | November 29, 2004 |

MEMORANDUM IN AID OF SENTENCING

The defendant respectfully submits this memorandum as an aid to the Court for sentencing and in support of his request that the Court give effect to the binding recommendation in the plea agreement. That recommendation is for a sentence of 46 months of incarceration. Part I of this memorandum discusses the background of the case; Part II discusses the Criminal History Category; and Part III discusses the reasons the Court should impose a sentence of 46 months.

**Part I - Background**

Hillary Clinton wrote a book entitled, "It Takes A Village To Raise A Child." The sequel, based on Antoine Morgan's life, should be, "It Only Takes One Family To Ruin A Child." This young man never had a chance. He was born into a household characterized by physical, sexual and emotional abuse, rampant drug and alcohol use, and a lawless lifestyle. Doctors who have evaluated him suspect that his mother used drugs while he was *in utero*. His full scale IQ was measured at 76 in 1998. The Department of Children and Families terminated parental rights to benefit several of his half-siblings. Unfortunately, the State did not act quickly enough to help Antoine.

Antoine began using marijuana at age 8. During his formative years, both parents were periodically incarcerated. His mother was incarcerated due to her neglect of Antoine and his siblings.[1] His father has a long criminal history including convictions for assault, robbery, larceny, burglary, and controlled substance offenses. Antoine's father was incarcerated numerous times during Antoine's

---

[1] As noted in the PSR, Antoine's siblings and half-siblings have not faired well. Some of them have been incarcerated, some are in foster homes, and the whereabouts of others are unknown. It appears that the Department of Children and Families was involved at some point with all of his siblings and half-siblings.

- 2 -

youth. His father was a heavy drinker and a heroin addict who beat those around him. Antoine has a two inch scar on his chin that he acquired at age 7 when he failed to get out of the bathtub quickly enough to suit his father. His father, who the Court may recall from the description in the suppression hearing, is a very large man (350 pounds at the time of the offense in this case). He hit his 7 year old son hard enough to send him flying face first into a bathroom fixture, splitting his chin. When his parents were incarcerated or otherwise out of the picture, Antoine lived with various aunts. With one, he acquired a 3 inch scar on the back of his head when she hit him with a hairbrush.

During the time between ages 14 and 17, Antoine made several suicide attempts. He has a long mental health history, and it is clear that his family has not only failed him in obtaining the necessary psychiatric help, but has certainly contributed to his problems. Put bluntly, it is impossible to imagine an 8 year old child smoking marijuana without at least the acquiescence, if not the direct involvement, of the parents. Moreover, abuse, such as they inflicted on him, creates problems that last long after the wounds have healed.[2]

It is sadly not surprising that, during the events leading up to the arrest in this case, Antoine's father not only failed to provided guidance or a good example, but to the contrary appeared to be well aware of the activities in that apartment that they shared. When the police came to the door, Kevin Morgan tried to force the door closed, blocked their entry with his body, and struggled with them until he was subdued.

At the age of 14, Antoine came to the attention of the State's juvenile authorities. It is often the practical reality that when there is a child in crisis and no suitable living arrangement, the juvenile justice system gets involved. The periods of commitment that follow do not always reflect the seriousness of the child's conduct or his culpability for criminal behavior so much as the need to remove

---

[2] The defendant's scars reveal his history of physical abuse. While the defendant did not reveal to the probation officer any history of sexual abuse, such references appear in at least one psychological evaluation. Ex D, p. 1. Understandably, victims of such abuse are often reluctant to talk about it, even though they may talk generally about the physical abuse. There is a different level of shame and embarrassment associated with sexual abuse, and the prospect of sharing the facts of those incidents with a stranger, such as a probation officer, is often daunting. Counsel for the defendant did not more vigorously pursue this history because, under the terms of the plea agreement, the sentence was specific and departures were waived.

the child from a poisonous environment and to provide the child with needed care. There were few options open to the juvenile authorities in Antoine's case. His parents were unable or unwilling to provide a safe, structured, crime-free environment. Moreover, Antoine was exhibiting the signs of emerging mental and emotional illness. It is against this backdrop that the Court should view the juvenile history in this case.

**Part II - Criminal History Category**

In discovery, the defendant received a copy of his criminal history or "rap sheet" from the government. See Ex A. That rap sheet revealed four arrests and convictions that resulted in seven criminal history points (including two points for committing this offense within two years of his release from confinement). On arrest numbers 1 and 2 (Ex A), the arresting agency was shown as "Misc State." When the probation office was preparing the presentence investigation report ("PSR"), it printed a new rap sheet. Ex B. This rap sheet showed the arresting agency on those two arrests as "D.O.C. Long Lan [sic]."[3] The probation office concluded that the defendant must have been arrested while at the Long Lane School, and it proceeded to seek the defendant's juvenile records. After contacting the State Juvenile Probation Office and providing that office with the general release that all defendants sign at the conclusion of their guilty pleas in federal court, the United States Probation Officer was able to view the defendant's juvenile records. If there was no Superior Court order permitting the disclosure of those records, they should not have been shown to the federal probation officer. See, C.G.S. 46b-124(b). In any event, the federal probation officer discovered that the Superior Court for Juvenile Matters had committed Antoine to the Department of Children and Families on several occasions after his arrest on various charges. See, PSR, paragraphs 33-41. The probation officer then counted the defendant's juvenile adjudications in the defendant's criminal history score, raising his criminal history from Category IV to Category VI. For the reasons that follow, the Court should strike those paragraphs from the PSR and find that the defendant's criminal history score is 7 points resulting in his placement in Criminal History Category IV. In the alternative, the defendant respectfully requests that the Court

---

[3]Long Lane School is now the Connecticut Juvenile Training School. It is not part of the Department of Corrections but is instead administered by the Department of Children and Families.

- 4 -

depart to Category IV or V on the basis that the counting of those points over-represents the defendant's criminal history. In either event, the defendant respectfully urges the Court to impose the 46 month sentence agreed upon in the plea agreement (which is within the ranges specified in either Category IV or V).

### A. These Juvenile Adjudications Should Not Be Counted

According to the PSR, Morgan was first arrested on September 18, 1998 when he was 14 years of age for a breach of peace. PSR, para. 33. The next day, he was charged with a Larceny in the Third Degree. Id. The Juvenile Court referred him to the Department of Children and Families ("DCF") and placed him at the Vitam Youth Treatment Center in Norwalk, Connecticut on February 3, 1999.[4] Id. Vitam, which is now out of business, was a privately-run drug and alcohol rehabilitation center for youths. It was not a locked facility. It was not in any way a jail. As noted above, Antoine had been using drugs since age 8, so there was ample reason to send him to such a place. During his stay in Vitam, Antoine engaged in a series of disruptive and assaultive behaviors for which he received additional referrals to DCF and commitments to Long Lane School. PSR, para, 35-41. It is Antoine's position that these juvenile adjudications should not be used to enhance his criminal history score because (1) there is no proof that they fall within the definition of "prior sentence" contained in U.S.S.G. § 4A1.2(a); (2) in any event, the Court's commitment of Antoine to the custody of DCF was a diversionary disposition that is not countable under § 4A1.2(f); (3) juvenile records in Connecticut are confidential and, as such, should not be used to enhance a sentence, under F.R.Crim.P. 32(d)(3)(B)[5]; (4) it is the general and sound practice in this district not to include juvenile adjudications in computing a defendant's criminal history score and the fact that it was done here creates an unwarranted sentencing

---

[4] Juvenile records in this state can be unreliable. As an example, the PSR, relying on the juvenile records, reports that the disposition of his breach of peace case took place on February 21, 1999. PSR, para. 33. That date is inconsistent with the dates contained in the body of the incident report set forth in detail in the remainder of paragraph 33. There, it is clear that Morgan was placed at Vitam on February 3, 1999 and he was transferred, after acting out at Vitam, to Long Lane School on February 21, 1999. His disposition, therefore, had to have taken place on or before February 3, 1999.

[5] That Rule provides: The presentence report must exclude:... (B) sources of information obtained on a promise of confidentiality.

- 5 -

disparity, and (5) even if, *arguendo*, there are circumstances imaginable where some juvenile sentences in this District could count, the convictions in paragraphs 33 and 35 should not count because they were for breach of peace and disorderly conduct, and the sentences for those offenses only count under limited circumstances not present here.

**Prior Sentence**

The guidelines define "prior sentence" for purposes of criminal history as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(l). For a juvenile adjudication to be treated as the equivalent of a criminal sentence, the record must demonstrate that each and every element of the alleged criminal conduct was established beyond a reasonable doubt. In re Winship, 397 U.S. 358, 368 (1970). The government bears the burden of proving the existence of any countable sentences that are to be relied upon to enhance a defendant's criminal history score. United States v. Marin-Cuevas, 147 F.3d 889, 895 (9th Cir. 1998); United States v. Martinez-Martinez, 2002 U.S. LEXIS 14585 (9th Cir. 2002)[unpublished] [copy attached as Ex C]. The record here is devoid of any evidence that the juvenile adjudications referred to in the PSR fall within the definition of a "prior sentence" contained in the guidelines. No records have been produced. The rap sheet does not contain these adjudications. The only evidence is the federal probation officer's summary of his review of the state probation officer's file. There is no showing that Antoine admitted to, or was found to have committed, all of the necessary elements of the "offenses" that form the basis of the delinquency finding. There is no showing that he was represented by counsel.

It is important to understand that the juvenile system is not a smaller version of adult court. There is no right to a jury trial, and the Court does not render a finding of guilt on the offense charged. Instead, the finding is whether the child is delinquent or not. The child pleads to or is found convicted of a status - not a crime. See, C.G.S. § 46b-140 ("In determining the appropriate disposition of a child **convicted as delinquent**....")(emphasis added). It is also important to know that a child may be found delinquent without committing an offense. Connecticut General Statutes Section 46b-120 (6) provides:

> A child may be convicted as "delinquent" who has violated (A) any

- 6 -

> federal or state law or municipal ordinance, other than an ordinance regulating behavior of a child in a family with service needs, (B) any order of the Superior Court, or (C) conditions of probation as ordered by the court....

In Antoine's case, the PSR (paragraphs 33-37) reveals that he was initially at Vitam (drug treatment center). It is not clear how he was placed there. The Juvenile Court has specific legislative authority to suspend delinquency proceedings for treatment of alcohol or drug dependency. C.G. S. 46b-133b. The Juvenile Court also has authority, in the case of a child with a mental illness who is delinquent, to commit such child to "an institution for mentally deficient children or youths or **delinquents**." See, C.G.S. § 46b-140(g)(emphasis added). It is not possible to determine, from the evidence we have, whether Antoine's subsequent commitments to the Department of Children and Families were the results of violating court orders to complete the program at Vitam, whether they resulted from findings that he had violated state statutes, or whether they resulted from a determination that he was a mentally ill delinquent in need of treatment.

Moreover, section 4A1.2(d)(l) of the guidelines provides for the assessment of two criminal history points only for a juvenile sentence "to confinement." It does not appear that the Court's commitment of Antoine to the custody of DCF was a sentence to confinement as contemplated by this section. Indeed, if it were, the sentence would have been illegal as contravening the statutory maximum for the offense. That is, the adjudications in paragraphs 33 and 35 of the PSR were for misdemeanor offenses that had statutory maxima of 6 months (Breach of Peace), and 3 months (Disorderly Conduct), respectively. See, C.G.S. 53a-36, 53a-181, 53a-182. The adjudication on each file was for a commitment to the Department of Children and Families for 18 months. This fact underscores the unique and rehabilitative nature of juvenile proceedings - which are not driven by the offense charged or its statutory penalties - but instead by the juvenile's status as a delinquent in need of care. This approach is consistent with the articulated goals of the juvenile justice system, set forth in C.G.S. § 46b-121h (listing eleven goals and conspicuously omitting "punishment" from the list). These are not criminal sentences tied to statutory penalties the way "prior sentences" are, as the guidelines contemplate that term.

For all of the foregoing reasons, there is not sufficient reliable evidence in the record to count these adjudications as prior sentences against Antoine. See, United States v. Martinez-Martinez, supra, [unpublished], copy attached as Ex. C.

**(1)   Diversionary Disposition**

Under the guidelines, a diversionary disposition by a juvenile court is never counted. U.S.S.G. § 4A1.2(f). The Sentencing Commission did not define what it means by a diversionary disposition, but, it is generally recognized that diversion at least includes a disposition that removes an individual from the punitive aspects of the criminal justice system and/or places him in a rehabilitation facility such as a treatment center, hospital or special school. Again, as noted in paragraphs 33-37, the Juvenile Court initially placed Antoine in Vitam, presumably to address his drug problems. In addition, it appears that the Connecticut Juvenile system was created to be a diversionary system, cut off from the adult criminal court (CGS § 46b-122) but permitting serious cases to be transferred to the regular criminal docket. See, C.G.S. §46b-127. Thus, for the ordinary, non-serious juvenile offender, the cases are conducted in sealed courtrooms, apart from the regular criminal docket, and the records are maintained with a high degree of confidentiality. If the child is determined to be delinquent, the stated goals of the juvenile justice system require the court to fashion a remedy that holds the child accountable but is in all respects geared toward a theraputic result. C.G.S. §46b-121h.

In this case, the juvenile court saw fit to place Antoine in the custody of DCF, an agency charged with the protection, not punishment, of children. The purpose of this referral was clearly to divert Antoine from the criminal justice system and place him in an environment that stressed drug rehabilitation. His initial placement in each of the cases noted in paragraphs 33-37 of the PSR was to Vitam Youth Treatment Center, a residential drug and alcohol rehabilitation facility for children. As such, it falls squarely within the ambit of a diversionary disposition which should not result in the assessment of any criminal history points in this case.

**(2)   Confidentiality**

In Connecticut, the records of juvenile proceedings are confidential. Section 46b-124(c) of the General Statutes provides:

- 8 -

> All records of cases of juvenile matters involving delinquency proceedings, or any part thereof, including court records, records of law enforcement agencies including fingerprints, photographs and physical descriptions, and medical psychological, psychiatric and social welfare studies and reports by probation officers, public or private institutions, social agencies and clinics shall be confidential and for the use of the court in juvenile matters and shall not be disclosed except (upon order of the court in specified situations).

It is not clear whether the probation office obtained the permission of the state judge to obtain Antoine's juvenile court records. It appears that the federal probation officer forwarded a copy of a general release to the state probation office. Beyond that, it is unclear who, if anyone, authorized the disclosure of these records to the federal officer. Moreover, if the records were obtained on the condition that they not be further disclosed, they were, in effect, obtained upon a promise of confidentiality within the meaning of F.R.Crim.P. 32(d)(3)(B) and thus should neither have been included in the PSR, nor used to enhance the defendant's sentence.

The records of juvenile proceedings are generally inadmissible as evidence in any criminal proceedings. Section 46b-147 provides:

> The disposition of any child under the provisions of this chapter, evidence given in such cases, except evidence of crime which, if committed by a person of sufficient age, would be punishable by imprisonment in the Connecticut Correctional Institution, Somers[6], and all orders therein, shall be inadmissible as evidence in any criminal proceedings against such child.

This statute is even more proof that juvenile records are intended to be confidential and should not be used to enhance Antoine's sentence in these proceedings.

**(3)** **<u>Unwarranted Sentencing Disparity</u>**

One of the primary goals of guideline sentencing is uniformity - that is, a reasonable assurance that there be no unwarranted disparity in the sentences imposed for similar criminal offenses committed by similar offenders. If these juvenile records are used in this case, the policy of using, or not using, juvenile adjudications to determine a defendant's Criminal History Category is not being applied uniformly in this District. In the vast majority of cases, the juvenile adjudications are not counted and

---

[6]At the time the statute was written in 1949, Somers was the maximum security prison in the state. Presumably, the statute is referring only to felony convictions.

are either not disclosed in the PSR or are mentioned in a segment of the PSR other than Criminal History. This is due in large measure, one would assume, to the confidentiality accorded to juvenile records in this State.[7]

In this case, however, the PSR has included juvenile adjudications in the Criminal History computation. This has the effect of adding eight criminal history points and raising Antoine's Criminal History Category to the highest level possible. In so doing, the probation office has created a substantial and unwarranted disparity by treating Antoine differently from other defendants whose juvenile adjudications are not counted. Defendant suggests that both the laudable goals of confidentiality of juvenile records and uniformity in sentencing can best be advanced by the adoption of a uniform policy to not count juvenile adjudications.

### B. If The Juvenile Breach of Peace and Disorderly Conduct Charges Are Not Scored, 46 Months Is A Permissible Sentence Without The Need For A Departure.

Antoine received 2 criminal history points for a breach of peace committed at age 14 and two points for a disorderly conduct committed at age 15. PSR, para. 33, 35. In the breach of peace offense, Antoine waived a bat toward a group of about 20 people and later yelled at the police. The Juvenile Court committed him to the Department of Children and Families and he was placed at the Vitam Youth Treatment Center. As a result of misbehavior there, he was charged with disorderly conduct and sent to Long Lane School. The conduct that resulted in the disorderly conduct charge consisted of Antoine, while agitated about taking a test, kicking a trash can and threatening to "kick the asses of the staff." Again, Antoine was 15 years old. As a result of his behavior, he was transferred to Long Lane. The PSR scores a total of 4 points for those two offenses.

United State Sentencing Guidelines Section 4A1.2(c)(1) provides the sentences for certain "prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." Listed in the group of presumptively uncountable offenses are disorderly conduct and disturbing the peace.

---

[7] Another reason would be the minimal due process afforded to juveniles.

- 10 -

The breach of peace and disorderly conduct charges in the PSR are clearly within the scope of this guideline. The sentences here were not terms of imprisonment, as contemplated by the guidelines. The defendant was sent to a drug program (not a locked facility), and due to misbehavior there, he was removed from the program and sent to a juvenile training school. As noted above, the juvenile system in this state was not set up to punish children, and confinement at Long Lane is not the equivalent of imprisonment. The term of the commitment was imposed without regard for and in excess of the statutory maxima for the offenses - again, an indication that these confinements were not considered to be terms of imprisonment. Finally, since there was no sentence of imprisonment and there was no probation, these offenses should not have been scored. Without those four points, the defendant's total would be 11 criminal history points. Even though that is one category higher than the parties had anticipated, the 46 month agreed-upon term is still within the resulting range. The defendant respectfully suggests that the Court should impose that sentence.

### C. A Downward Departure is Warranted

The defendant submits that a downward departure from the suggested guideline sentencing range is appropriate for the following reasons, either alone or in combination. See United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996) (Court may depart in extraordinary case when a number of factors that, when considered separately would not warrant a departure, combine to create a situation that differs significantly from the norm).

#### (1) Criminal History Departure

The guidelines contemplate a downward departure in those cases where a court concludes that a defendant's criminal history category significantly over-represents the seriousness of his criminal history. U.S.S.G. § 4A1.3 (Policy Statement). Here, Antoine's criminal history score is inflated by what are described as juvenile adjudications, resulting in 8 additional criminal history points. All of these of these adjudications resulted in a referral to DCF custody, not to adult court and not to the Department of Corrections. All the "offenses" consisted largely of acting out behavior by a mentally ill 14-15 year old with a history of being himself physically abused in a highly dysfunctional family. Some of these offenses involved more bravado than anything else - i.e., waiving a bat at a crowd of 20

- 11 -

people and shouting at the police (PSR, para. 33), and kicking a trash can and threatening to "kick the asses" of the staff at Vitam (PSR, para. 35). The defendant remained in DCF custody for only a period of months, from February to November, 1999 at which time he was returned to his family. Under these circumstances, the court should recognize that Antoine's criminal history is significantly less serious than that of most defendants who qualify for Criminal History Category VI.

In light of the unique facts and circumstances of this case, the defendant submits that a modest departure to Criminal History Category IV or V is appropriate. In either event, the agreed-upon sentence of 46 months would be available.

**(2) The Court Should Depart To Give Effect To The Plea Agreement.**

The parties in this case attempted to achieve a just result by entering into this plea agreement. The calculations were entered into in good faith, and the parties submit that the contemplated result is appropriate to nature and circumstances of the offense and to the history and characteristics of this defendant. 18 U.S.C. 3353(a). If the Court finds that higher guidelines apply than the parties anticipated, the Court should depart to give effect to this result contemplated in the plea agreement.

Plea bargaining remains an important part of the criminal justice system in the federal courts. Approximately 98 percent of cases are resolved by plea bargain. The Second Circuit has long recognized the importance of plea bargaining and has recognized the validity of departing to give effect to a plea agreement. See, e.g., United States v. Fernandez, 877 F.2d 1138, 1144-45 (2d Cir. 1989). Indeed, the practice of departing to give effect to plea agreements is widespread. The Sentencing Commission reported to Congress that "pursuant to plea agreement" was the stated reason for 18.1 percent of all departures nationwide in 2001. See, United States Sentencing Commission, *Downward Departures From The Federal Sentencing Guidelines*, Report To Congress, October 2003, p. 46.

A sentencing court is charged with the responsibility of imposing a sentence that is "sufficient, but not greater than necessary," to accomplish the goals of sentencing, 18 U.S.C. § 3553(a). Departures are authorized for the express purposes of addressing unusual circumstances and unusual cases. As the Supreme Court has noted, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study

- 12 -

in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996). The unusual features of this case, including the facts and circumstances surrounding the defendant's criminal history score, his mental and emotional conditions, and his plea agreement render a downward departure particularly appropriate. Defendant submits that he should be sentenced to 46 months in jail.

### (3) Mental And Emotional Conditions

The defendant's tragic upbringing and mental and emotional conditions also support a departure. The PSR cites some examples of the defendant's history of abuse, and the social history section reveals a highly dysfunctional upbringing. The PSR includes some mental health diagnoses that the defendant has received. PSR, para. 56, 63, 68, 69. The defendant has also been diagnosed as having Post-Traumatic Stress Disorder and Dissociation Disorder NOS. Ex D. The defendant's mental and emotional conditions are severe enough that the defendant has been deemed disabled for purposes of social security benefits. PSR, para. 74.

There is a high correlation between childhood abuse and later anti-social behavior. For example, there is a high correlation between childhood/adolescent abuse (physical and/or sexual) and drug abuse. (Dembo, *The Relationship Between Physical and Sexual Abuse and Tobacco, Alcohol and Illicit Drug Use Among Youths In A Juvenile Detention Center*, International Journal of the Addictions 23(4), 1988)("Our results support the proposition that child abuse, either sexual or physical, is positively related to high rates of illicit drug use"); (Allers, Benjack, White, and Rousey) *HIV Vulnerability And The Adult Survivor Of Childhood Sexual Abuse* (1993)("The child abuse literature reports persons who abuse alcohol and drugs are frequently the survivors of childhood physical and/or sexual abuse. In the case of adult survivors who abuse substances, the chemical begins as a way to manage the psychic pain, but then becomes a problem in and of itself. These addictive behaviors tend to increase feelings of powerlessness, shame, and self-loathing, which in turn intensify the need to use and abuse substances.")(internal citations omitted).

Adults who were abused as children have a far higher incidence of criminal behavior than those who were not subjected to abuse. See, *Crime And Juvenile Delinquency Prevention Policy: Time For*

- 13 -

*Early Childhood Intervention*, 2 Georgetown Journal On Fighting Poverty 245, 247 (1995)("A child who is abused or neglected faces a 53% greater chance of being arrested as a juvenile, a 38% greater chance of being arrested as an adult, and a 38% greater chance of being arrested for a violent crime, than does his peers who are not abused or neglected.")[citing Cathy S. Widom, *The Cycle of Violence* (1992)].  See also, *The Social Context of Capital Murder: Social Histories And The Logic Of Mitigation,* 35 Santa Clara Law Rev. 547, 567-69 ("[S]tudies show that juveniles who have become involved in delinquency have endured child abuse and neglect at far greater rates than estimates for the population as a whole and for low income groups in particular.  We certainly know that abused children are much more likely to engage in violence as adults, giving rise to what some have called a 'cycle of violence.'"); Rivera and Widom, *Childhood Victimization and Violent Offending*, 5 Violence and Victims 19 (1992)(neglected and abused African-American male children have a higher likelihood of arrests for delinquency, adult criminality, and violent criminal behavior); *Family Violence And Family Property: A Proposal For Reform* 13 Law & Inequality 401, 424 ("Statistics show that experiencing or witnessing abuse as a child is the greatest predictor of later criminal and abusive behavior").

The combined effect of the defendant's history of childhood abuse and his mental and emotional problems is a tragic circumstance that removes this case from the heartland anticipated by the Sentencing Commission. The Second Circuit has recognized that a district court may consider a defendant's personal circumstances in deciding whether a case was within the heartland of the guidelines. United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996)(defendant's medical condition and charitable works supported departure).  Furthermore, the Second Circuit has recognized that extreme childhood abuse that contributed to the defendant's criminal behavior can form the basis for a departure. United States v. Rivera, 192 F.3d 81, 85 (2d Cir. 1999).  Likewise, courts in this district have relied, at least in part, on a defendant's history of childhood abuse, either sexual or physical, to support a departure under U.S.S.G. 5K2.0 or under 5H1.3.  See, e.g.,  United States v. Garriques, 3:96CR-49(RNC)(illegal re-entry case, defendant physically abused and rejected by parents) United States v. St. Fleur, 3:95CR-12(TFGD)(bank robbery defendant sexually abused as child); United States v. Ubarri, 5:92CR-69(JAC)(drug conspiracy defendant physically and emotionally abused); United States

- 14 -

v. Dahlman, 3:97CR-196(DJS)(bank embezzlement defendant sexually abused as child); United States v. DuPerry, 3:97CR-102(PCD)(bank robbery defendant subject to significant history of physical abuse).

Courts have also recognized, when a defendant has a history of abuse, that a departure may be warranted under U.S.S.G. § 5H1.3. Section 5H1.3 provides that mental and emotional circumstances are "not ordinarily relevant," making this a discouraged, but not a prohibited factor for departure. See, Koon v. United States, 116 S.Ct. 2035, 2045 (1996). If a discouraged factor is present to "an exceptional degree," a sentencing court may rely upon it to support a departure. Id.

Here, Antoine's abusive upbringing and the mental and emotional conditions that have emerged from that upbringing have dominated his life and have most certainly contributed to his elevated criminal history score. Much of his criminal history, as noted above, involved his acting out while a teenager under the supervision of juvenile authorities. Eight of his fifteen criminal history points resulted from juvenile arrests. It is no stretch to conclude that Antoine's abusive upbringing and mental and emotional conditions have contributed both to the offense in this case and to his criminal history. Under these circumstances, a modest departure is warranted.

**Part III - Reasons To Accept Plea Agreement**

The overriding principle behind this agreement is one of fairness. That is, the parties attempted to come up with a resolution that was fair under all the circumstances. The factors that went into the complex calculus were as follows.[8] First, Antoine is a young man with a horrible upbringing and a history of mental health problems. His past history and current mental problems would likely have been the subject of a downward departure motion. In reaching this agreement, the defendant waived departure claims and appeal rights in favor of a specific term of incarceration.

Second, this case was brought pre-Blakely, and it would appear that the indictment would have to be superseded for any guideline enhancements to be considered at sentencing. Absent an agreement, there likely would have been a trial, or a jury may have had to determine sentencing issues. There were

---

[8] It should be clear that in setting forth these factors, the defendant is not contending that the government necessarily agreed with the correctness of the defendant's position. Nor is the converse true. In short, both sides recognized a plethora of issues that could affect the outcome to either party's gain or detriment. As such, it was a good case to try to achieve a compromise.

- 15 -

potential credibility problems with many of the witnesses to this event. Indeed, although the parties did not know it at the time the agreement was made, Officer Nathaniel Ortiz, one of the main witnesses in this case, has resigned as a police officer and is under criminal investigation for lying to a judge in state court. The parties have considered this fact at this point, and they have decided to go forward under the terms of the plea agreement. Officer Ortiz' predicament merely confirms the parties' concerns that the outcome of a contested trial or sentencing proceeding was uncertain.

Third, the defendant gave up the right to challenge a remaining issue pertaining to his motion to suppress. That is, the Court relied on United States v. Patane, 542 U.S. ___, 2004 U.S. LEXIS 4577 (June 28, 2004) to resolve the issue of whether the gun discovered as a result of Morgan's unwarned statements could be admitted at trial. See, Ruling on Defendant's Motions to Suppress, p. 16. Patane, however, limited its holding to unwarned but otherwise **voluntary statements**. Patane, at 2004 U.S. LEXIS ***673. Since the Court appeared in its suppression ruling to have found psychological coercion involved in the police interrogation (Ruling, p. 14), the defendant believes Patane is inapplicable inasmuch as the statement was not voluntary.

Fourth, to reflect the seriousness of the offense, the defendant agreed to a sentence at the top of the contemplated guideline range. Again, he waived all departures, appeals, and collateral attacks in favor of a specific sentence.

Fifth, the finality of this resolution was a factor. At the time the plea was negotiated, the district and circuit courts were taking many different tacks on what to do post-Blakely. At that point, Morgan had been in jail since January 27, 2003 on a pretrial basis. The parties attempted to reach a result that each could find fair no matter the outcome of the post-Blakely shakeup. This result also allows the defendant to finally become a sentenced inmate so that he will be able to partake of programs that may help him. Pretrial inmates have little opportunity to participate in programs.

The parties still believe, wholeheartedly, that this agreement provides a just result to this case and to this defendant. Each gave up valuable positions to achieve a fair outcome. This was not expediency but a good faith effort to deal with a difficult case. We stand by the agreement.

- 16 -

**Conclusion**

For all of the foregoing reasons, the defendant respectfully asks the Court to impose a sentence of 46 months.

        Respectfully submitted,

        The Defendant,
        Antoine Morgan

        Thomas G. Dennis
        Federal Defender

Dated: November 29, 2004        /s/
        Terence S. Ward
        Asst. Federal Defender
        10 Columbus Blvd, FL 6
        Hartford, CT 06106-1976
        Bar No. ct00023
        (860) 493-6260

        CERTIFICATION

I HEREBY CERTIFY that a copy of the foregoing memorandum in aid of sentencing has been mailed to Thomas Daily, Assistant United States Attorney, Federal Building, 450 Main Street, Hartford, CT 06103, on this 29 day of November 2004.

        /s/
        Terence Ward